Case number 19-5208, Holly Schulkers, et al. v. Elizabeth Kammer, et al. Argument not to exceed 15 minutes per side. Mr. S. Chad Meredith, you may proceed for the appellant. May it please the Court? My name is Chad Meredith, and on behalf of the Commonwealth of Kentucky, I represent the state social worker defendants in this case, Allison Campbell, Elizabeth Kammer, and Kara Unknown. Your Honors, may I reserve three minutes of my time for rebuttal? Very well. Thank you, Your Honor. Your Honors, at issue in this case is whether these social worker defendants are entitled to qualified immunity for their actions in an investigation of potential child neglect. The District Court wrongly denied qualified immunity on alleged violations of the Fourth Amendment, substance due process, and procedural due process. I'd like to discuss each of these in that order, but first I'd like to begin with a brief overview of the circumstances of this case because the circumstances of this case exemplify precisely why qualified immunity exists to begin with. Your Honors, these social workers were confronted with a situation involving a newborn baby and a mother who tested positive for opiate use. The mother also admitted to taking prescription cough medicine that was not prescribed to her, so it was not a huge stretch for these social workers to believe that if she had a positive drug test and admitted to taking prescription medicine that was not prescribed to her, that maybe she was, in fact, abusing medication. That's not much of a stretch to make at all. The baby was set to be discharged from the hospital. If the mother was abusing drugs, that would obviously put the baby's safety at risk. The social workers needed to act quickly to ensure the safety of the baby and the other children at home. They had no way of knowing at that point that Ms. Shulkers was not abusing drugs. Well, all the drug tests were negative for her abusing anything, and the earliest drug test was done right away, as I understand, and the subsequent tests confirmed the first test. Well, Your Honor, the very first drug test came back positive for opiate use. And at the time the social workers got involved, that was the only test they had. Well, I mean the test thereafter. I know there was one that the initial test generated all this activity. But thereafter, and apparently her, I guess, explanation was she must have tested positive as a result of eating poppy seeds. Well, I think that was a potential, and also the use of the prescription cough medicine was also a potential, Your Honor. But the social workers at the time they interviewed Ms. Shulkers only knew that there was a positive drug test. The problem with the case is it's, what, three days later they know it's a false positive and they continue their course of conduct, even though the basis for their initial actions was shown to be incorrect.  It's not the initial three days when they thought there was a positive, but afterwards when they, in face of all this evidence, continued their conduct anyway. Judge Griffin, I disagree with the premise of your question because I don't think they did know it was a false positive. They had a positive drug test. They had an admission from the mother that... and on the evening of the 10th the results of her additional urine test are reported, which are negative, and the next day the results of the umbilical cord test come back negative. So within not much more than 48 hours less we know that it probably was a false positive and that was reported to the social workers. And then they continued for two months after that to keep her from having full contact with her children, unlimited contact with her children. Judge Doctor, I disagree with a few of those facts. You're correct that there were two negative drug tests. So at the time the baby was going to be discharged from the hospital there was a positive test, there were two negative tests, and the mother also admitted that she had used prescription medicine that didn't belong to her. But I think when you tell us she used prescription medicine that hadn't been prescribed to her and it's possibly cough medicine, I think you're stretching that argument just a little further than I'm willing to see it go. Sure. Well, Judge Daughtry, we don't know exactly, it's not in the record exactly what kind of prescription medicine it is, but some prescription cough medicine has codeine in it, which is an opiate. But you don't even know whether that was codeine in it. Correct. She said she didn't know. That's correct, Your Honor. I mean, this is taking a few cherry-picking a few facts and stretching them all out of reason. Well, Your Honor, at the time they entered into the prevention plan, all the social workers knew was this baby was getting ready to be discharged from the hospital and the mother has tested positive for opiates. They had to do something. There have been a lot of instances in Kentucky in recent years where... Now, wait a minute. What day did the prevention plan come into being? It looks to me like it was the 12th. No, Your Honor, I believe that's incorrect. I believe it was the 10th. I believe it was the day after birth. So at the time of the prevention plan, all that the social workers knew was that there was a positive test, the mother had admitted to using prescription medicine, was not prescribed to her, and there were not negative tests. They needed to act quickly to ensure to investigate. All right, I'll give you that. But when all these tests come back negative, and I think it was Kammerer was told to lift the prevention plan, what date was that? Well, Your Honor... What date was that? My understanding is on the 21st of February is when the hair follicle test came back. And beyond that point, the prevention plan was never enforced again. So the prevention plan was enforced for 11 days. Well, what do you mean by enforced? When the hair follicle test came back negative, the plaintiffs informed the Commonwealth of Kentucky that we're not going to adhere to the prevention plan anymore because we've got our confirmation that it's a negative test and we're not going to adhere to it. And the Commonwealth made no effort to enforce it at that point. They acquiesced in that. Why didn't they lift the plan and notify the parents? Well, Your Honor, I'm not sure that this is in the district court's opinion, but the reality is the parents' attorney went on vacation to Europe and the Commonwealth had difficulty communicating with the attorney. I believe there was a HIPAA release form that they needed to get so the Commonwealth could get the official test results from the hair follicle test. And when the attorney got back and all this got taken care of, I think the plan got lifted officially. But the plan was never enforced again after the 21st. So it was enforced for 11 days, and these social workers felt like they needed to make a reasonable investigation of the situation. They're not toxicologists. Keep that in mind. We're looking at this through the hindsight of 2020 with all the benefit of expert knowledge about toxicology and what these test results mean. But at the time when they had one positive and two negatives, you know, people... What do you mean when you say the plan wasn't enforced? The parents were not told that the plan was not in effect. As far as they knew, the plan was in effect and being enforced. Isn't that so? Well, I'm not sure, Your Honor. I don't know. I mean, they told the Commonwealth that they were not going to adhere to the plan anymore. And the Commonwealth acquiesced in that. The Commonwealth did not make no effort whatsoever to enforce the plan beyond that point. These sound like factual disputes, and I'm not sure we even have jurisdiction. This is a denial of qualified immunity, and you can't appeal the facts. You have to appeal pure questions of law in regard to denial of qualified immunity. And it seems like your arguments are all fact-based. Well, that's a good point, Judge Griffin, and I disagree. Because all these fact questions we're talking about are ultimately irrelevant to the legal questions. And let me turn to those briefly. The legal questions here are Fourth Amendment, substantive process, and procedural due process. Even under all the facts found by the district court, my clients are entitled to qualified immunity. On the Fourth Amendment claim. Well, you have to concede the facts to take a qualified immunity appeal. But you're raising facts that your opposing counsel are not likely completely to agree with. Well, Judge Clay, to answer your question, I'm trying to answer the court's questions about what actually happened. But you're right, all that's irrelevant. We're stuck with the record as found by the district court. We're actually stuck with the allegations made by the plaintiff, aren't we? I mean, do you have to take those as plausible, I guess? There was limited discovery allowed prior to qualified immunity, and so it was a summary judgment motion. So I think the question is, based on the facts found by the district court at the summary judgment phase, are my clients entitled to qualified immunity? Judges can find facts at summary judgment. They have to determine whether they're genuine issues of material fact or not. But usually at summary judgment, you don't do fact-finding. Well, that's right. We're stuck with the record as it exists at the summary judgment stage and the district court's view of those facts. And my point is, even if all of the plaintiff's allegations are correct, even if all that— That's a better argument. Yes, sir. The plaintiff's facts, as they allege, you're still entitled to qualified immunity for both the 14th Amendment and 4th Amendment as a matter of law. Correct. Let's hear your argument again. Correct. Well, Your Honor, on the 4th Amendment issue, the district court defined the right at issue much too abstractly and generally. Qualified immunity applies to an official's conduct unless it is so egregiously bad that it amounts to a willful, knowing violation of the law or, from a constitutional standpoint, clearly incompetent behavior. That didn't happen here. The district court essentially held that the social workers violated clearly established law because, in the district court's view, 4th Amendment principles apply to social workers and the 4th Amendment— They do, don't they? Well, it does. But the point is that the district court viewed the rights at stake much too generally and broadly. In the case of District of Columbia v. Wesby, the Supreme Court held that clearly established means that a legal principle must prohibit the official's conduct in the particular circumstances before him. It's not enough that a rule can be suggested by existing precedent. It must be compelled by controlling authority or a robust consensus of persuasive authority. It must be settled law, especially in the 4th Amendment context where the test is somewhat imprecise. The imprecise nature of the 4th Amendment makes specificity even more important in the 4th Amendment context. That's what Wesby held. It held that directly. So the question is, where is the authority showing that this— Aren't there cases where the 4th Amendment has been applied when children were taken out of a classroom without the consent of the parents? Your Honor, I do not believe that there is any consensus or clearly established law saying that's the case. In Barber v. Miller, this court held that it wasn't clearly established that warrantless in-school interviews violate the 4th Amendment. Some courts have said that. How long do we keep on saying that there isn't any clearly established law? Well, Your Honor, I think that— As I understand it, the district court judge here said, stop this. There isn't any clearly established law.  And from now on, there will be clearly established law. Isn't that what he did? I believe that's right, Your Honor, but that would apply to behavior that occurs after this point. It's not fair to hold these social workers accountable. Unless we say he was wrong about there being no clearly established law. Correct, Your Honor. That's right. And there was no clearly established law because at the time— Your Honors, I see my time is up. May I use an extra minute of my rebuttal time to address a couple other issues? All right. We'll have a minute of your rebuttal time. Thank you, Your Honor. Your Honors, it's not even clear to me there was a seizure here. Because in Brent v. Wayne County Department of Human Services, they said that interviews with a social worker in a home of a teenager was not a seizure. If it's not even clear there was a seizure, I'm not even sure that it's clearly established there was a 4th Amendment violation. You know, in the home, you're in home territory. Your parents may be there. But when they come into a school and take you out of class in front of all your classmates and put you in a room with the door closed and nobody there but the social worker, what is a young child to think? Well, Your Honor, I think the point is there is no clearly established law saying that it's a 4th Amendment violation. And it's the same with the substance due process and procedural due process claims. Under the Wesby principles, Wesby says you've got to have some specificity. There's got to be clearly established law on point. It doesn't have to be the exact same facts, but it's got to be pretty close. And we don't have that here. There's no clearly established law. Romero v. Brown from the Fifth Circuit from earlier this year said that a balancing test is difficult terrain for a party having to prove a clearly established violation of law. And that's what we've got with all these claims. We've got balancing issues on both procedural due process, substantive due process, and 4th Amendment. So there's no way if we're all, if lawyers and judges and experts are all debating whether there was even a violation at all, it's difficult to imagine how social workers who aren't trained in the law would have known that their conduct was violating clearly established principles. Well, I have to suggest to you that there was not a lot of good training in this case. When your supervisor tells you to lift a plan and you don't do it, that really, you don't follow orders. I mean, what kind of training had they had? I'm sorry, you don't have to answer that. Your time is up. May I answer it, Your Honor? It's all right with me. Judge Clay. Go ahead. Thank you, Your Honor. Your Honor, on that issue, the district court found that the substantive due process right to oversee the care, custody, and control of your children was violated from the point where the two months after the umbilical cord or the hair follicle test because they didn't officially lift it for that two-month period. The point, though, Your Honor, is that the right to oversee the care, custody, and control of the children was not affected during that period because the Commonwealth made no effort whatsoever to enforce the plan during that period. It wasn't enforced. Their right to oversee the care, custody, and control was not affected during that. Let me ask you again. I think we're getting into disputed fact again, but did the parents know nobody was going to show up and take the children off to foster care? Had somebody from the state or the social worker agency told them that they were ole, ole, income free? Well, Your Honor, I think on the record we've got, I think the answer is no, but the substance of due process clause does not give them a right to be free from that worry. It gives them a right to not be interfered with in the care, custody, and control of their children, and that right was not interfered with beyond that point. All right. Thank you very much. Thank you, Judge. Good morning, Your Honors. Good morning. Paul Hill on behalf of the Shulkers family. Your Honors, I have to admit that I was curious as to what arguments that I would hear today from opposing counsel in order to justify what the social workers did to this family. This case is going on three years now from the date the baby was born, and over that time there's been more than 2,000 pages of legal arguments generated. And among those, I've heard all the arguments. I've heard it was because of the opioid crisis, which really doesn't make any sense because of all the people in the opioid crisis, we know that Holly wasn't one of them. Overworked case workers doesn't, again, make much sense because they're wasting time if they're investigating somebody who's been proven not to be a drug abuser. Also heard it was a lawyer's fault. But as it came down, I guess what we heard at the end was their main argument. There's no clearly established law. There's no case on point. And it all comes down to notice. It comes down to fair warning. For instance, to paraphrase Judge Griffin in Garriton, the Flint, Michigan, water case, the lack of an outrageous act as precedent does not provide immunity, whether it showcases the grievousness of the act. So just like in Hope v. Pelzer, in which the Supreme Court found that you didn't need a prior case of a prison guard tying someone up to a hitching post to give notice to that official that he couldn't do it, and just like in Flint, Michigan case in Garriton, thank God we didn't require another public official poisoning a water supply. It's apparent from the conduct that they cannot do that. And that's the notice that's involved. And we did brief. We provided our acknowledgment of what clearly established law was. Judge Bertelsman did that, I believe, in a well-reasoned opinion. And also in our brief, we've noticed the fact that, for instance, in Williams-Ash, Smith v. Williams-Ash, the court's reasoning can be used in order to establish clearly established law. So what we're looking for is fair warning to these officials so they know what they cannot do. And just as a matter of practicality, at least as far as Cabinet workers in Kentucky go, it's not working. One of the Cabinet officials I deposed is Robin Brown, Campbell's supervisor. She's been with the Cabinet in various capacities since 2001. She testified that she's received hundreds of hours of training and trained other workers. I asked her this question and received this answer. Have you ever been trained or trained someone based upon any federal Supreme Court case or Sixth Circuit case or Sixth Circuit Court of Appeal case as to what they can or cannot do in relation to dealing with families alleged to have abused their child? Her answer was, not that I recall. So what does provide these workers notice of what they can and can't do? Allison Campbell said in her deposition, you obviously can't open a case for no reason against anyone. You need a reason. In this case, I think we can all agree that the hospital sent the report that there was a presumptive positive urine screen of Holly's drug test. And then they notified the Cabinet. The Cabinet relies upon the Kentucky statutes and their Bible, as they say, which is their standards of practice guideline. In their standards of practice guidelines, it states, reports of substance abuse are not accepted unless the reporting source provides supporting information that would cause a reasonable person to believe that the caretaker's use is impairing their ability to meet the needs of their children. So not even accepted, let alone going to the hospital and imposing the sanctions that they impose. So that's the social worker's fair warning. So what did they do? And I believe reasonably receiving that report, they went to the hospital and they found Holly in her hospital bed with her baby. And they noticed a few things. Number one, Holly had been breastfeeding since within an hour of birth. The baby was perfectly healthy. Holly denied any drug use. She answered all of their questions. The medical staff at St. East all told them that the baby was completely healthy. Sometime later that day, they actually spoke to Holly, the baby's doctor, and the baby's doctor told them that the baby was completely healthy, that there was no issues during the pregnancy, that there was no concerns with this baby. So they asked Holly to submit to another drug test, which she did, which came back within a few hours. And this would have been on a Friday night. The baby was delivered on a Thursday. So on Friday night within, oh, an hour and a half, the drug test came back negative. They had the doctor's information. They knew the baby was healthy. On Saturday during the day, the umbilical cord test, which had been ordered, came back. Now that's the gold standard because that goes back five months, and that shows that the baby was completely healthy and that Holly didn't ingest any drugs and wasn't anything in the baby's system. There was no need for concern. And to get back to what the cabinet had to use, so in order to find abuse, it's not just drug use. The standard in Kentucky is the statute under the definition of abuse or neglect. And what that is is a person, an abused or neglected child means a child whose health or welfare is harmed or threatened when a parent engages in a pattern of conduct that renders the parent incapable of caring for the immediate and ongoing needs of the child, including but not limited to parental incapacity due to drug use. So that's the standard they needed. And within 24 hours, they knew it didn't come close to existing. So... When did they have her sign the prevention plan? So the prevention plan, thank you, Judge. The prevention plan they had at the initial encounter. They had her sign a prevention plan. Actually, what happened was Camer, who had been with the cabinet just a few months and was still in training, had Holly get on the phone with Allison Campbell, her supervisor. Prior to any prevention plan being signed, Campbell said, until this gets figured out, you are no longer allowed to be around children without the approval of, without approved supervisors. Without, and then asked her, you know, how long have you been on heroin and let me get the help you need to help your child, all the other things. And then, importantly, which distinguishes this case from Williams-Ash, Camer came by and said, prevented, and showed the prevention plan, which is one page that requires, Holly will have supervised contact with all children by approved supervisors until notified by the cabinet. Supervision means eye and ear shot at all times, 24-7. And then at the bottom is the stamp, which says, absent effective preventative measures, foster care is a planned arrangement for this child. Importantly... Your argument is it was signed under duress? Yes. It was not consensual? Correct. All the threats that they made? Correct. Importantly, there was never a planned arrangement for foster care. It was a lie. And then they say, we will take the baby away. If you don't sign, yes, if you don't sign, we're going to take the baby and then we'll go to court, which is importantly, which distinguishes the case. And so within a day, they had all the information that we just discussed. They had talked to the doctor, the baby was healthy, they had the drug test come back. And at that point, on Monday, they went to the school, went to two different schools, children ages 8, two 9-year-olds, and a 13-year-old. Took them out of class. One by one, the school personnel were not permitted to go with the children. Brought them into a small room and interviewed them. Closed the door. Interviewed each one of them. And I believe in the brief, they mentioned the children were fine, they weren't scared. Well, they weren't fine when they got home to their mother, and that's been pled, and that's part of the proof in this case. The children, as you can imagine, when they ask you about your mom, is she using drugs? Is Mommy and Daddy fighting with each other? Is there alcohol around the house? They were scared. They were scared something was going to happen. They were going to be taken away. Or is Mommy going to jail? And importantly, on the Fourth Amendment issue, at the point the cabinet workers went to that school, the Shulkers family had achieved the unusual status of being proven innocent. So one could certainly argue that if this court determines that it was okay for the social workers, as the court discussed, that we should clearly establish some law. If the court says it was okay to do what they did, it's okay for them to go randomly and interview any child based upon anything. Because here we have a presumption of innocence of every person in America. Well, I would argue that the Shulkers at that point were elevated above that because the cabinet workers knew for certain that there wasn't an issue of abuse or neglect. Yet they continued to go in to that school and do that. And to argue, again, I believe Judge Daugherty, you questioned whether or not they were told, if Ms. Shulkers was told that she was off that plan. No. And it was a constant worry for her. That's why she hired an attorney. That's why the attorney told her that she did not have to comply or told her not to comply, but warned her. Believe me, they can come, they can go ex parte to a judge and they could get an order any time and come get you. So she continually called the cabinet, asked to be formally released. They would not release her. And I would suggest to the court to go through the cabinet records for them to say they weren't doing anything for that period of time. They were calling David Shulkers' ex-wife. They were in communication with him because she was upset. They were contacting the children's school to attempt to get records. They were contacting the children's doctors to try to get records, all during this two-month period of time, all with Holly calling and saying, can I please be released? Two months later, she finally was. Your Honors, for the purposes of what we're doing here, these facts beg the following questions. Did the cabinet workers need fair warning to know that they could not threaten immediate removal of children in order to obtain a signature on a prevention plan? Did they need fair warning to know it was a violation of a family's rights to present a prevention plan with a stamp claiming there was an arranged plan of foster care when there wasn't one? Did they need fair warning to know it was a violation to seize little children out of school and interrogate them for a half hour each when they knew there was not any proof of abuse or neglect? Can I ask just a minute about the personnel? Kammer was the person who had the initial contact at the hospital. Yes. Campbell was the supervisor but was not at the hospital. Correct. She was on the phone. On the phone. Who went to the school and interviewed the children? Kammer did at the direction of Campbell, and she took another worker with her. And you're telling me that Kammer had been a social worker with that agency for just a few months? A few months. She had 14 cases in which she presented 14 prevention plans, all with a stamp on them. This was Kammer's first pregnant lady having a baby with an alleged drug issue case. Okay. Thank you. In closing, Judge, I've been reading and listening now for almost three years that it was okay what happened here because there was no case directly on point. There was no clearly established law. Well, let's clearly establish some today that says it's not okay to do what was done to this family. If there are no questions, Judge, I'll stop. You don't want to acknowledge that there was no clearly established law because that might give qualified immunity to the other side. Judge, if I misspoke, I apologize. I'm not saying that there wasn't any clearly established law. I'm just saying let's make it specific to this case. So there is a case out there. Judge, the arguments that we made in our brief and Judge Bertelsman's brief really point to the fact that there was fair warning to these workers to do what they did, that they shouldn't have done what they did. All right. Okay. Thank you. Thank you very much. Any rebuttal? Your Honors, Mr. Hill asked a seminal question here today, which is he said several times, what provides the social workers notice of what they can and can't do? That is the seminal question. Where is the clearly established law telling them that what they did was clearly wrong? This is a case about a judgment call made in the face of uncertainty.  They have not pointed to a single case involving a judgment call. You don't dispute that what they did was unreasonable, do you? You're saying there was no clearly established law based upon the existing cases. But you don't deny that this course of conduct was unreasonable, do you? Well, Judge, I get why they're upset. I'm a parent. If this happened to me, I'd be very upset too, and I would be upset. But that's not the question. The question is not whether somebody did something wrong. The question is whether somebody violated clearly established constitutional law such that qualified immunity should be denied. And the answer to that is no. This court can still say that it's not okay what happened here and still apply qualified immunity. The court can say that constitutional rights were violated. Mr. Hill said, let's make clearly established law today. Well, if this court wants to say that going forward this is okay, then the court has the prerogative to do that. But as we stand here today, it was not clearly established in February 2017 that these were constitutional violations. This court said in Barber that as of 2011, it's not a Fourth Amendment violation to interview children in school without a warrant. Nothing has changed since then. There's no clearly established law on that. That's the Fourth Amendment. How about the Fourteenth Amendment? Correct, Your Honor. Do you have cases that show the right was in doubt at this time? Well, Your Honor, I'm not aware of a single substance of due process case where qualified immunity was denied when children were not removed from the home. To my knowledge, the only time qualified immunity is denied is when children are actually removed from the home. It didn't happen here. And, Your Honor, I'm not sure on the procedural due process issue. Well, wait a minute. They weren't removed from the home, but they were certainly the threat was there, number one. And, number two, there was some kind of shield brought down between the mother and children. Well, Your Honor, the to supervise and control her own kids. Your Honor, I'll say two things in response to that. You're correct. The threat was there. But the Commonwealth always has the authority to go to court and attempt to remove children when it suspects that there is neglect or abuse in a household. So why didn't they go to court here? They could have, but to be honest, Your Honor, they thought it was less intrusive to enter into the prevention plan because then the children would not be removed. And let me point out also that the plaintiffs got to pick who would help supervise Ms. Shulkers. It was her husband and her mother-in-law. That's not especially intrusive. The social workers felt like that was a pretty reasonable alternative. Well, yeah. I just hope that Holly and her mother-in-law have a fairly good relationship. Doesn't that interfere with a family relationship to have conditions that you can raise your own child? Isn't that basically unconstitutional if you don't have a basis for it? Well, Your Honor, you're correct that it does interfere with the family relationship. And that's a 14th Amendment right, is it not? The 14th Amendment protects the right of parents to oversee the care, custody, and control of their children. You're correct. It protects against unreasonable interference with that relationship. And why isn't that clearly established? Because, Your Honor, that's defining the right much too generally because that right must be balanced against the Commonwealth's right to investigate potential child abuse and child neglect. And as the Fifth Circuit held in Romero just this year, when you've got a balancing test, that's especially when you should apply qualified immunity because you're second-guessing the work of these social workers. What are we second-guessing when all the results are negative at this point? And there is really no basis to think that she took any opioids. I mean, at this point, there really is no basis for continued investigation as far as I can see. Well, in hindsight, we can say that, Judge. Okay. I mean, what is there? I mean, you had an initial test, which was only a urine test, and then you had these other tests including the umbilical cord, which I believe the counsel's right. That really is the gold standard. That's a better test than the urine test. So everything shows that there's no drug use, but they continue to interfere with the family relationship without a basis at all. Well, Your Honor, I would say a couple things. One, the plaintiffs had an attorney during this process. The attorney did not object to the prevention plan. The attorney said, let's do a hair follicle test. And it's not clear to me what process they thought was due here that wasn't provided. Their briefing suggests that they should have had a hearing before the prevention plan. Hearings are not required in this circuit unless you're going to remove the children from the home. That didn't happen here. Well, why did the attorney have to object when the mother was constantly calling, trying to persuade the state to relinquish her from the plan? The state was constantly getting these complaints from the parents, not wanting to be in the plan. I don't know if they needed further notice from the attorney. But the case where you were saying that there was not a case clearly establishing the right, in line with what Judge Griffin was saying, this Troxell v. Granville case from the United States Supreme Court, unequivocally said it's clearly established that a parent has a 14th Amendment right to make decisions concerning the care, custody, and control of their children without arbitrary government interference. So it was seen that there is a clearly established right from the United States Supreme Court on this. Well, Judge Clay, I agree with that in general. But that's defining the right much too broadly. The right at stake here and the violation at stake must be defined with specificity. That's what the Supreme Court said in the District of Columbia v. Wesby. And while there is a right of parents to oversee the care, custody, and control of their children, that right must always be balanced against the right of a state to investigate child abuse and child neglect. And when you have a balancing factor at issue, then that is not typically a situation where you want to deny qualified immunity because it's not obvious to the social workers when they've got a positive drug test that the right for parents to oversee care, custody, and control of children must bow or must prevail in that case over the state's right to investigate child abuse. It's just not clearly established here. There's no case on point for any of their claims, and they didn't identify any. It really doesn't have to be a case on all fours, does there? Well, Your Honor, I agree. It does not have to be the exact same case. I agree with that. Just like the Flint Water case. I mean, we held that the conduct there was so egregious that the defendants, the Flint Water folks, were on notice that putting contaminated water out for public use violated the 14th Amendment, even though there was not another case where we found anybody had ever done that before. There are certain actions that are so obviously violative of the Constitution that the standard is whether defendants had fair notice of what they did violated the Constitution. And as Judge Clay pointed out, the right of a family relationship to be free of unreasonable interference by the government has been clearly established for a long time. Judge Griffin, I agree, but we're talking about a very different circumstance there. Deliberately putting out tainted water for use by the public is a much more egregious situation. How about interfering with a family relationship when the social workers know that the results are all negative? I mean, that's really conclusive, that there is no drug use here. And I think that's after the Abelica Court test. There really is no doubt, I don't think. And they nevertheless persist with attempting to interfere with the relationship. Judge, I don't think they knew that, but I think it's important to point out. You don't think they knew the test? Well, I think it's important to point out that they didn't know that there was no opiate use because the district court found that the violation, the clearly established violation of law, was from the period after the hair follicle test came back. But beyond that point, the parental rights, the parental right to govern the care, custody, and control of children was not interfered with after the hair follicle test came back. Counsel, I think we have your argument in hand, and the red light's been on for quite a long time now. So we're going to have to call a halt. We have a lot more cases piled up here. So thank you for your arguments. The case was well argued on both sides, and the case is submitted. Thank you. Thank you, Your Honor.